Lessee of BUCHANAN *against* M'CLURE and SMITH.

THIS cause was tried before BRACKENRIDGE J. at a Circuit Court for *Northumberland*, in *May* 1804. It was an eject-ment for land lying within the purchase from the Indians of *November* 1768. The lessor of the plaintiff claimed under an improvement and settlement made between the date of that purchase, and the opening of the land office on the third of *April* 1769. He also shewed an application for the land, entered the day on which the land office was opened, and drawn in the lot-tery devised at that time to fix the priority of the respective applications. The defendants claimed under an application de-scriptive of the land, entered on the same day with the plaintiff's, but of a *prior* number according to the decision of the lottery.

*An improve-ment and settlement on lands pur-chased from the Indians in November 1768, made between that date and the opening of the land office on the 3d April 1769, give no prefer-ence to the settler against a descriptive application entered in the land of-fice on the day it opened.*

The reason of resorting to a lottery, as well as the effect of it, appeared by a statement drawn up by the proprietary officers at the opening of the land office. It recited that the 3d of *April* 1769 being appointed for opening the land office for the new purchase made at the treaty of *Fort Stanwix*, and it being known that great numbers of people would attend ready to give in their locations at the same instant, it was the opinion of the governor and the proprietary agents, that the most unexcep-tionable method of receiving the locations, would be to put them all together, after being received from the people, into a box or trunk, and after mixing them well together to draw them out, and number them in the order they should be drawn, in order to determine the preference of the applicants. Those who had settled plantations, especially those who had settled by permis-sion of the commanding officers to the westward, were declared to have a preference. But those persons who had settled or made *what they called improvements, since the purchase*, it was declared should not thereby acquire any advantage.

Upon this case his Honour charged the jury, that an improve-ment and settlement made between the time of the purchase in 1768 and the opening of the office on the 3d of *April* 1769 within that purchase, gave a preference to the settler, even against an application properly describing the land; and that No. 2, accompanied with such a settlement, was entitled to a

1808.      preference over No. 1. The jury accordingly found for the
           plaintiff. A motion for a new trial was then made and overruled,
Lessee     and the defendants appealed to this court.
of
           Upon the argument here, several questions were raised which
Buchanan   had no connection with the principal point, the misdirection of
v.
M'Clure.   the Judge in his charge. Upon this point—

           *Watts* for the defendant argued, that the proprietaries, who
           were the exclusive owners of the soil, had a right to grant it up-
           on any terms they chose; and that by the preamble to the lotte-
           ry they explicitly refused a preference to a settlement like the
           plaintiff's. That therefore the settlement was out of the ques-
           tion, and the case stood upon the two interfering applications,
           of which the defendant's was first drawn. With respect to lands
           previously purchased of the *Indians*, the uniform practice of the
           proprietaries in giving a preference to settlers, had, it was true,
           at last made the law in regard to those lands; but with reference
           to this purchase there was no usage established before the
           opening of the land office; and the circumstance of the office
           remaining shut as to these lands five months after the purchase,
           was of itself an evidence that no title to them could originate in
           that interval. If an improvement after the purchase could have
           been the foundation of a title, the proprietaries could not have
           performed the promise made by the lottery, the scheme of
           which went expressly upon the ground that no preference at-
           tached to such improvement. The preference was limited to a
           meritorious class of people who had settled under special licen-
           ces before the purchase, or having gone on without licence had
           left their settlement in consequence of the act of 3d *February*
           1768, 1 *St. Laws* 489., and the proclamation of the governor
           founded upon it. On these principles the board of property de-
           cided in favour of the defendant, in *March* 1770; and in *Novem-
           ber* 1789 there was a verdict and judgment before *Atlee* and *Rush*
           Justices of the Supreme Court, in conformity to that decision.

           *Evans* for the plaintiff contended, that as he had settled on the
           land after the purchase was made, he was entitled to a preference,
           whether the proprietaries were willing to give it or not. The
           acts of Assembly countenanced the settlement by prohibiting it
           only on unpurchased lands; and the instant the purchase was
           made, the right of settlement attached in the citizen under the

influence of a practice, which at last had become the law of the land
as to all the vacant lands in the Commonwealth. Settlement was
not confined to a particular district; it was a mode of obtaining
title, as operative as a warrant, and as extensive as the unap-
propriated land in the state. It did not depend upon the land
office being open. To cut off the right to settle these lands dur-
ing the interval in question, was in fact to say that it could not
exist after the land office opened, until it was expressly sanc-
tioned by the proprietaries; for the usage could not apply with
more force to these lands after the office opened, than it did
before. The proprietaries however did not intend to deprive
the plaintiff of a preference. Such an intention is not to be pre-
sumed, as it would have been unjust, and the preamble does not
in fact discover it. The real object was to deprive individuals
of any advantage from a mere colourable improvement; " such
" persons as had made *what they call improvements*, should not
" acquire any advantage;" but there is nothing to exclude the
preference legally due to those, who like the plaintiff, made a
*bona fide* settlement with much labour, and in the extremity of
winter.

*margin:* 1808.

Lessee
of
Buchanan
*v.*
M‘Clure.

Tilghman C. J. This cause was tried at a Circuit Court
at *Sunbury* in *May* 1804, when a verdict was given for the
plaintiff. A motion for a new trial was made and overruled,
upon which the defendants entered an appeal to this Court.
The principal reason relied on in support of the appeal, is a
supposed misdirection in point of law by Judge *Brackenridge*,
who directed the jury that an improvement and settlement
made between the time of the purchase by the late proprieta-
ries of *Pennsylvania* of the *Indians* in the month of *November*
1768, and the opening of the land office on the 3d *April* 1769,
for the sale of the lands included in that purchase, gave a pre-
ference to the settler against an application properly describing
the land in question, entered in the land office 3d *April* 1769.

The counsel on both sides made a written request that *all* the
Judges of this Court would sit on the argument here, and this
request has been complied with to prevent a failure of justice.
Without such request we should have found ourselves under
great difficulty. Judges *Yeates* and *Smith* are so nearly related
to Mr. *Charles Smith* who is concerned in interest, that if it
could have been avoided they would have declined sitting.

1808.

Lessee
of
BUCHANAN
v.
M'CLURE.

Judge *Brackenridge* delivered the opinion from which an appeal was made, and I was concerned in the trial as counsel for the defendants.

To form a correct decision in this cause, it will be necessary to advert to the terms on which the land office was opened 3d *April* 1769. At that time the population of *Pennsylvania* was very considerable; and it was foreseen by the proprietary officers, that the applications for land at the same instant would be numerous, and that probably there would in many instances be more than one application for the same tract. In order therefore to put all persons on an equal footing, (after satisfying the claims of the officers who had served in the army raised by the province of *Pennsylvania* some years before, and a few special grants to persons who were entitled to particular favour,) they determined to decide the preference of all applications by a lottery, and to ask no part of the purchase money till twelve months from the date of the application. At the same time it was expressly declared that " those who had settled plantations, especially " those who had settled by permission of the commanding officers " to the westward, should have a preference. But those persons " who had settled or made what they call improvements *since* " *the purchase, should not thereby acquire any advantage.*" Notice was given by public advertisement 3d *February* 1769 of the terms on which the office would be opened, and the opening was delayed till 3d *April* 1769 for the express purpose of giving the back inhabitants sufficient time to bring in their applications.

The counsel for the appellee have made two points. 1. That the settler was entitled to a preference by the law of the land, of which the proprietaries could not deprive him. 2. That he was entitled to a preference by a fair construction of the terms on which the office was opened 3d *April* 1769.

Title by settlement has always been favoured, and under proper restrictions it deserves favour; but it must not be supported to the destruction of all other rights. It cannot be denied, that the late proprietaries, who were absolute owners of the soil, had a right to make sales, and to grant rights, on what terms they pleased. If they had thought proper to grant no kind of right, but upon payment of the purchase money, neither the legislature, nor the courts of justice could have controlled them. But as they had been in the habit of encouraging poor settlers

who were unable in the beginning to pay any money, this practice at length grew into a right, and what had originated in benevolence became the law of the land. I speak now of the lands sold by the proprietaries prior to the year 1769. The last purchase made by them of the *Indians* was at *Fort Stanwix* 4th *November* 1768. In opening their office for the sale of these lands, they determined, as has been already mentioned, to give no preference to persons who settled between the 4th *November* 1768 and the 3d *April* 1769. To have given such preference would in a great measure have defeated the equitable intention of putting all persons on an equal footing. Nor could there be any just cause of complaint against the regulation adopted by the land office. Only a few months intervening between the purchase and the notice of the opening of the office, and those months including the winter when improvements cannot be carried on to great extent, it was improbable that any one could have been induced to go to considerable expense, under an idea that he would obtain a preference by settlement.

But there was a class of settlers of another description, whose case was entitled to a different consideration. This leads me to the *second* point, the true construction of the terms proposed by the land office. Although it had always been the policy of the proprietaries and the legislature to discourage settlement on lands not purchased of the *Indians*, because it gave offence to the *Indians* and might produce war, yet when the seat of war between *Great Britain* and the colonies, and *France* and the *Indians* allied to her, was transferred to the *Ohio* and the country between *Pittsburgh* and the great lakes, it became extremely convenient and almost necessary that there should be a chain of inhabitants on the military roads leading from the settled country to the western waters. For this purpose the commanding officers of *British* forces had been in the habit of granting licences to settle, and in many instances persons seated themselves without licence, but under an implied permission. These people were exposed to great danger, and many of them were cut off by the savages in their frequent incursions. This kind of settlement had taken place chiefly, but not altogether, in the western parts of the state. It is to be remarked too that many of those who had settled without licence, were entitled to favour, because they had relinquished their settlements in consequence of an act of Assembly passed in the spring of the year 1768, and a proclamation issued by the governor in pursuance

*1808.*

*Lessee
of
BUCHANAN
v.
M'CLURE.*

1808.

Lessee
of
Buchanan
v.
M'Clure.

of it. It was thought reasonable therefore, that a preference should be given, on the opening of the land office, to " those " who had settled plantations, especially those who had settled " by permission of the commanding officers to the westward." Had the proprietary order stopt here, there might have been some ground for arguing that the words of the order included *all* settlers prior to the opening of the office, however different their cases or merits might be. But, to take away all doubt, the order proceeds to exclude *certain settlers* by negative expressions, viz. " those who had settled, or made what they call improvements " since the purchase." It is contended that these negative words are to be restricted to those persons who only made trifling improvements, without having settled plantations. But neither the expression, nor the reason of the thing, justifies this restriction; the words " those who had settled" include all kinds of settlement; and the reason of the order, as before explained, certainly demanded that no preference should be given to any kind of settlement made after the purchase.

I have hitherto considered this matter as if it were a new point. But that is far from being the case. It has been understood ever since the opening of the land office in 1769, that those persons who settled between 4th *November* 1768 and 3d *April* 1769 were entitled to *no preference*. The board of property determined so in the case of the very land now in dispute, on the 26th *March* 1770, in a cause between *John Buchanan* and the late Dr. *William Smith*, under whom the defendants claim. The same principle was laid down by Chief Justice *Chew* before the revolution, as I am informed by my brother *Yeates* in the case of *Kidd's Lessee* v. *Campbell*, and by Chief Justice *M'Kean* and other Judges of the Supreme Court since the revolution, in the cases of *Thompson's Lessee* v. *Beeler* and *Sheerer's Lessee* v. *M'Clure;* and it is admitted that this has been the uniform opinion and course of decision at *Nisi Prius*. Now although the point has never been brought before this court in bank, yet when a principle affecting titles to land has been supported for near forty years by repeated decisions at *Nisi Prius*, from which no appeal has been made, it appears to be so incorporated with the law as to render it dangerous to touch it.

I am of opinion on the whole that the judgment of the Circuit Court should be reversed, and a new trial ordered.

YEATES J. and SMITH J. concurred.

BRACKENRIDGE J. I take this to be the first time that the point has come before the court in bank. It had come more than once to my knowledge, before Judges of the Supreme Court at Nisi Prius. I always took it to be simply the question, whether a *prior settlement* could be affected by a *posterior office right;* for the only distinction that could be taken in the case was, that the usage under which settlement was protected, did not extend to that portion of time which elapsed from the purchase of 1768 until the opening of the office in 1769: a period of about five months. Why it should not, I had never been able to comprehend. Is it because the office was not open to take out rights during this period? This ought to furnish the stronger reason in support of the usage, which had its origin in the office not being open to take out rights during the proprietary minority. It was not in the face of any act of Assembly to settle; for the law prohibited only settlements *before the purchase*, but this was *after the purchase*. It was not in the face of the proclamation of the proprietary governor, commanding settlers to remove; for that respected residents before the purchase. Was it because that on the opening of the office in 1769, the proprietary declared that in respect to the locations drawn on that day, the third of *April*, no regard would be paid to those who had settled, and made what *they called improvements*, since the purchase? It could not be; because, if the settlement could protect against a grant, the declaration *ex post facto*, or retrospective, could not take the protection of the law away. It was *lex sub graviore lege;* a law of their own in the usage they had countenanced; sanctioned by the act of Assembly in the year 1730, 1 *St. Laws* 248. and which had been established by the decisions of courts and the verdicts of juries. But it was not their meaning, and they have not made it; it would involve an inconsistency in the declaration. For settled plantations made *before the purchase*, are declared to be respected; and shall they be understood to say, that settled plantations made *since* the purchase shall not? The first made when there was a law against it, and the second when there was no law, and no intimation from any authority that it was prohibited. Settled plantations, *especially by the permission of the commanding officer*, carries with it the implication, that without the permission of the commanding officer, settled plantations were to be respected. " *Settled or made what they call improvements,*" therefore

1808.

Lessee
of
BUCHANAN
v.
M‘CLURE.

means something else than settled plantations, and inferior to this.

But let it be the meaning of the declaration, that no preference shall be given in case of a number drawn, from being coupled with a settled plantation made since the purchase, it does not necessarily follow that they shall be considered as saying that no settlement shall be respected as protecting against an application. But if they had said it, the previous question occurs: could their saying so supersede the usage, and the law of settlement as to settlement made before? If so, no evidence can be given of settlement made in that isolated space of five months. It is an interval cut off from the usage. How could settlers be aware of this, who during the winter after the purchase, with great suffering and much labour, went upon the ground and established a residence? It is argued that the proprietary not opening the office and granting warrants, evinced that no disposition was to be made for some time of the lands then lately purchased from the Indians. This is not the fact. There may not have been what are usually called warrants, issued to all applicants, but there were orders of survey; they were called special orders; and yet it has never been understood, nor do I know even any Nisi Prius decision, that these special orders could affect the settlement; I mean since the doctrine of improvement came to be recognised at Nisi Prius, which I admit was not the case for a period of time. It is well known that from the year 1783—4, when the first Nisi Prius Court was held within the purchase of 1768 after the revolution, Chief Justice M‘Kean, and the associates with him, overruled all evidence of improvement; so that settlements were swept away indiscriminately until about the year 1789 or 90, when Judges Smith and Yeates came to hold the Nisi Prius Courts, who admitted evidence of improvement, and the whole doctrine of legal tenure as to office right and improvement underwent a change; Chief Justice M‘Kean himself at subsequent Nisi Prius Courts concurring. I admit that after this period on a second ejectment, M‘Clure v. Shearer, evidence of an improvement made between the purchase November 4th 1768 and 3d April 1769 was overruled, as it had been on the first trial, to my great surprise; for the ejectment was brought in consequence of the change of decisions. It appeared to me an inconsistency: for why what is called an application for a survey, should have a

greater effect than a special order, I have not been able to comprehend; or rather, to put the point fairly, why settlement made in the interval after the purchase and before the opening of the office should not be protected. It is the inconsistency and contradiction in the doctrine of improvement with which I am dissatisfied. Either let the principle be rejected altogether, or let it apply generally. The principle after much struggle has been established, and it is the partial application which I resist; for which I can see no reason, and which I take to have originated in temporary misconception; or it is my misunderstanding which yet exists.

1808.

Lessee of BUCHANAN v. M'CLURE.

Judgment reversed, and
New Trial ordered.